(No. 47006

ROBERT L. MUELLER, Adm'r, *et al.,* Appellants, v. SANGAMO CONSTRUCTION CO., Appellee.

*Opinion filed Sept. 26, 1975.—Rehearing denied Nov. 21, 1975.*

442

GOLDENHERSH, J., dissenting.

Robert L. Mueller and James T. Londrigan, both of Springfield, for appellants.

W. J. Simhauser, of Springfield, for appellee.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

The principal issue in this case is whether all of the evidence, when viewed in its aspect most favorable to plaintiffs Robert L. Mueller, administrator of the estate of Willard H. Maberry, and Betty L. Maberry, his widow, so overwhelmingly favors the defendant, Sangamo Construction Co., that a verdict for plaintiffs can never stand. (*Pedrick v. Peoria and Eastern R.R. Co.*, 37 Ill.2d 494, 510.) A subsidiary issue is whether an absence of due care on decedent's part precludes recovery by his widow of funeral expenses. Ill. Rev. Stat. 1973, ch. 68, par. 15.

Plaintiffs filed in the circuit court of Sangamon County a two-count amended complaint in the first count of which the administrator sought to recover damages under the Wrongful Death Act (Ill. Rev. Stat. 1973, ch. 70, par. 1 *et seq.*); recovery of funeral expenses was sought by the widow in count II. A jury returned verdicts in the amount of $90,000 for wrongful death and $2,199.50 for

expenses, upon which the trial court entered judgment. The appellate court reversed (20 Ill. App. 3d 602), and we allowed plaintiff's petition for leave to appeal.

Decedent, Willard H. Maberry, was killed while driving a 51-foot tractor and trailer unit northward on what was then U.S. Route 66 south of Springfield. The accident occurred a short distance south of the point where the divided highway crossed a portion of Lake Springfield on separate, but parallel bridges. Defendant, Sangamo Construction Co., pursuant to a contract with the State, was responsible for constructing the highway approaches to the bridges.

U.S. Route 66 was then a four-lane highway with the two southbound lanes separated from the two northbound lanes by a grassy median strip. During construction of the new, easternmost bridge, all traffic was routed over the old, westernmost bridge. This was accomplished by detouring the northbound traffic across the median on a left-curving, temporary blacktop leading to the old bridge.

After construction of the new bridge for northbound traffic had been completed, new blacktop pavement was laid continuing the northbound lanes northward around a curve and across the new bridge. This newer surface, at its joinder with the existing lanes, was slightly darker. The center line of the existing lanes was continued northward, with a slight deviation, by applying white, reflecting paint to the surface of the newer pavement, as was the white, reflecting stripe along the right-hand edge of the pavement. "Lane delineators," steel posts with white reflectors, were also placed at intervals of 50 feet along the right shoulder of the highway through this area.

While the detour to the old bridge had been in use the center line of the northbound lanes had followed the curve of the detour to the left. After the new center line leading to the new bridge had been painted on, the old one was still visible, despite attempts to erase it, although much less visible than the new line, and the two lines diverged in

what resembled a large "V." Weighted 55-gallon steel drums with "hazard markers" extending 4 feet above the barrels were spaced 50 feet apart along the left-hand edge of the northbound lanes through the area where the old detour had been. The barrels had horizontal stripes of reflecting white paint, and the "hazard markers" had alternating, diagonal stripes of black paint and reflectorized white tape impregnated with glass beads. There was testimony by State troopers and the highway engineer that the barrels were frequently moved, as a result of being struck, from their designated positions but that the markers were in place late in the afternoon or early evening of the day of the accident. There was no artificial lighting in the area, and the witnesses characterized the whole construction area as a hazardous one.

After the detour to the old bridge had been abandoned, a pile of rubble consisting of chunks of broken concrete and blacktop accumulated on the former roadway. Because of its distance from both north and southbound lanes, the highway engineers did not consider it hazardous, and it was neither lighted nor marked. Its size was estimated at 10 to 20 feet in diameter and 3½ to 5 feet in height, and it had existed for a period estimated by witnesses from 1 week to 2 to 3 months. Apart from this pile, the surface of the old detour was covered with loose and rough disintegrated asphalt.

The testimony further established that some 2000 feet south of the point at which the old detour had left the highway there were reflectorized signs on each side of the northbound lanes warning "Road Construction Ahead, 45 M.P.H."; approximately 500 feet further north similarly situated signs indicated a curve to the left, and reflectorized signs some 500 feet north of those warned "Detour Ahead."

Earl Gwillim, a truck owner and operator who owned the truck driven by decedent, testified that the driver of that truck sat some 5 feet above the ground and had a

better view of the road ahead than a car driver; that decedent, recently returned from Viet Nam where he had served in an armed forces motor pool, had worked for him some 10 days to 2 weeks and as a driver for other employers previously; that decedent had made two trips over the same route at night during the week preceding the accident; that at the time of the accident the truck was loaded with approximately 43,000-49,000 pounds of sheet steel; that the tractor-trailer unit when so loaded and traveling 40-50 miles per hour could be stopped on a concrete highway within 275-300 feet without "locking" the wheels, that locking them might cause the steel sheeting to move forward into the truck cab, but that it was safe to use normal braking pressures; that the witness had driven trucks over this area and had caught himself following the old center line.

Paul Bains, a truck driver and eyewitness, was in his car 200-300 feet behind decedent. He estimated decedent was traveling 40 to 50 miles per hour, and further stated that the truck moved from the right to the left lane, and that it did not slow down nor did the stoplights or turn signal come on either before or after decedent ran off the road; that other trucks with their lights on were coming from the north in the southbound lanes; that as the truck left the road he saw "something" flying through the air and that it could have been one of the barrels; that there was a mashed barrel and hazard marker underneath the tractor drive wheels when the tractor came to rest atop the rubble pile.

State Trooper Garwood testified that the truck came to rest with the cab on top of the rubble pile; that the "right front" of the stopped tractor was 28 feet from the edge of the northbound roadway and 233 feet from the point where the detour left the roadway; that the surface of the old detour was rougher and that there were no skid marks.

The accident occurred about 11 p.m. when decedent

apparently followed the partially erased, but still visible, old centerline onto the original detour and collided with the rubble pile. Sheets of steel "like a deck of cards" were found in front of the tractor, and it is apparent that the upper part of the tractor cab was sheared off when the force of the impact caused the steel sheeting to burst its bindings and move forward through the cab.

The trial judge denied defendant's motion for a directed verdict because he was under the impression that Bains had testified that decedent had reduced his speed upon entering the construction area. In fact, Bains' testimony is that he did not observe any reduction in the truck's speed.

The appellate court reversed the trial court judgment for plaintiff stating "the credible evidence in this record negates any reasonable inference that he was in the exercise of due care and caution for his own safety." We agree.

Our cases clearly require that one who seeks damages because of the negligence of another must establish that he has exercised due care for his own safety (*Carter v. Winter*, 32 Ill.2d 275, 282, and cases there cited), and the absence of such showing, or affirmative evidence of contributory negligence, will bar such an action. (*Coleman v. Illinois Central R.R. Co.*, 59 Ill.2d 13, 18.) As we noted in *Pedrick*, "Clearly, the constitution does, and judges should, carefully preserve the right of the parties to have a substantial factual dispute resolved by the jury, for it is here that assessment of the credibility of witnesses may well prove decisive. [Citations.]" (37 Ill.2d 494, 504.) There is in this case, however, no credibility issue, for the relevant facts are physical ones and largely undisputed.

Decedent was not unfamiliar with the area, having driven safely through it on two prior occasions, both at night, within the preceding week. The sole eyewitness, who had followed the truck from a point prior to entering the construction zone, observed no decrease in its speed,

no turn signal as it moved into the left lane and no activation of its stoplights as it left the roadway and traveled 233 feet over the old, rough detour roadbed. Plaintiffs argued that decedent could not safely use his brakes because severe braking would cause the load of steel to shift into the cab. Leaving aside the implications of that argument as to the lack of due care inherent in driving a truck which cannot be safely braked under emergency conditions, we note the undisputed testimony by the truck owner that normal braking pressures could be safely applied. More importantly, however, decedent, in following the old, partially erased center line, as he apparently did, ignored the newer, "much more visible" center line leading directly ahead as well as the reflectorized lane delineators and new, white striping along the right edge of the road, all of which were designed to clearly outline the highway edge and direction. Additionally, the testimony of eyewitness Bains that he saw what could have been a hazard-marker barrel "flying through the air" as decedent left the northbound lanes, coupled with the presence of at least one mangled barrel and marker under the drive wheels of the tractor, are persuasive evidence that decedent likewise ignored them.

Conceding, *arguendo,* that defendant's failure to completely obliterate the old center line and permitting the rubble pile to remain unlighted constituted actionable negligence, decedent's conduct, in our judgment, so clearly fails to establish due care on his part that "no contrary verdict could ever stand."

The subsidiary issue earlier noted is whether decedent's failure to exercise due care for his own safety precludes his widow from recovery of funeral expenses paid by her. The appellate court reversed, without discussion, the judgment in her favor for those expenses. This court in *Saunders v. Schultz,* 20 Ill.2d 301, 309-10, held there was "no legally cogent reason for denying a spouse the right to recover for medical or funeral expenses

incurred on behalf of a mate who was wrongfully injured or killed" in view of the joint and several liability therefore imposed upon husband and wife by the Married Women's Act (Ill. Rev. Stat. 1969, ch. 68, par. 15). The defendant in that action questioned the sufficiency of the widow's complaint in that it failed to allege that her deceased husband had been free from contributory negligence. Defendant's answer had there alleged as a separate defense that decedent had been guilty of contributory negligence, and plaintiff's reply specifically denied that allegation. This court held these circumstances, coupled with the fact that the trial court's instructions to the jury required it, before returning a verdict for the plaintiff, to find the decedent free of contributory negligence, cured any conceivable defect in the complaint. While the opinion in that case does not squarely pass upon the issue presented here, the implication seems clear that decedent's lack of due care would bar plaintiff's recovery. The rationale of *Saunders* was that plaintiff's liability for funeral expenses resulted from the defendant's tortious conduct and that the burden should fall upon the tortfeasor. But here the liability of plaintiff was occasioned, at least in part, by decedent's lack of due care, and the *Saunders* rationale is inapposite. Related cases involving actions for loss of consortium and medical expenses are in almost unanimous agreement that the contributory negligence of the deceased or injured spouse or child precludes recovery, as is the Restatement of the Law. See, *e.g., Ross v. Cuthbert* (1964), 239 Ore. 429, 397 P. 2d 529; *Pioneer Construction Co. v. Bergeron* (1969), 170 Colo. 474, 462 P. 2d 589; cases collected in 21 A.L.R. 3d 469 (1968); Restatement (Second) of Torts sec. 494 (1965).

The judgment of the appellate court is accordingly affirmed.

*Judgment affirmed.*

MR. JUSTICE GOLDENHERSH, dissenting:

I dissent. The majority correctly states that "The principal issue in this case is whether all of the evidence, when viewed in its aspect most favorable to plaintiffs Robert L. Mueller, administrator of the estate of Willard H. Maberry, and Betty L. Maberry, his widow, so overwhelmingly favors the defendant, Sangamo Construction Co., that a verdict for plaintiffs can never stand. (*Pedrick v. Peoria and Eastern R.R. Co.,* 37 Ill.2d 494, 510.)" (61 Ill.2d 441, 442.) Compliance with the directive of *Pedrick* requires the consideration of evidence apparently disregarded by the majority.

The testimony shows that in order to reroute the two northbound traffic lanes from the old bridge to the new, a detour was constructed in the highway, south of the bridge. The detour for northbound traffic began near the north end of a sweeping left curve in the old highway, and the old highway continued its curve to the left, into the median between the northbound and southbound lanes.

In order to provide a smooth transition for traffic leaving the old road and going onto the detour lanes defendant had been required to install an "overlay." The overlay was an inch of asphalt which covered the top of the old roadway including the edge line and the center line of the old pavement. Because of salt used during the winter the overlay was broken loose and had been removed. The texture and color of the surface of the road to the south of the "V" were the same as that of the old highway which curved to the left from the "V". The surface of the detour lanes was blacktop and darker than that of the old highway. Although several efforts had been made to paint out the reflective center line of the old highway it was exposed and visible. The testimony is undisputed that as the result of being struck by vehicles, the marker barrels were frequently moved from their designated positions; that there was no lighting where the

detour commenced; that the lights of southbound vehicles presented a hazard, and that there was no lighting on the rubble pile or any warning of its presence.

The majority apparently finds significant the fact that "Decedent was not unfamiliar with the area, having driven safely through it on two prior occasions, both at night, within the preceding week." 61 Ill.2d 441, 446.

Maberry was on a 300-mile trip from Granite City to Chicago. There is no testimony concerning the weather, degree of darkness, placement of the barrels, the condition of the center line of the old road, or the presence of parallel and opposing traffic at the time of the other trips. Nor is there any evidence or persuasive argument that because he had twice previously traveled over the route he should have remembered whether every traffic marker or warning along the route was accurate, or as here, inaccurate, misleading and hazardous. Any inferences from the fact that Maberry had traveled this section of highway on two occasions within a week or 10 days prior to this occurrence were to be drawn by the jury.

The majority also states "Plaintiffs argued that decedent could not safely use his brakes because severe braking would cause the load of steel to shift into the cab. Leaving aside the implications of that argument as to the lack of due care inherent in driving a truck which cannot be safely braked under emergency conditions, we note the undisputed testimony by the truck owner that normal braking pressures could be safely applied." (61 Ill.2d 441, 447.) This does not accurately state the testimony. The testimony was that loaded as it was, and traveling on dry level pavement at a speed of 40 to 50 miles per hour, the tractor-trailer unit could be stopped in a distance of 275 to 300 feet. The testimony also showed that "locking" the brakes to make a sudden stop could result in the load of steel shifting forward through the bulkhead of the trailer into the cab of the tractor, as it did when the truck struck the rubble pile.

The record shows that the decedent, upon arriving at the detour, was confronted with a type of "V" intersection in the highway; the road bearing to the left was of the same color and texture as the road over which he had been traveling; the reflectorized center stripe of the old road curving to the left was clearly visible and a sign located approximately 1500 feet to the south had warned of a curve to the left. At that point the decedent was confronted with the decision whether to continue onto the left curve or jog to the right on the detour lanes. He was further confronted, upon seeing the rubble pile, with the decision whether to risk the dangers resulting from a sudden stop. A person who without fault on his part is confronted with sudden danger or apparent sudden danger is not required to act with the same deliberation and foresight which might be required under ordinary circumstances. (*Kavanaugh v. Parret,* 379 Ill. 273.) Issues of negligence or contributory negligence should ordinarily be decided as questions of fact for the reason that "Negligence is a composite of the experiences of the average man and is thus usually confined to jury evaluation." (*Keating v. Jones Development of Missouri, Inc.* (5th Cir. 1968), 398 F.2d 1011, 1014.) Whether, under the circumstances shown by this record, the deceased was in the exercise of due care for his own safety was decided by the jury, and the proper application of the rule of *Pedrick* requires that the verdict be reinstated.